Good morning, Your Honors. Steve Hubachek, Federal Defenders, on behalf of Mr. Ortiz-Romero. Your Honors, this morning I'd like to address the Lopez and identification issues. Of course, I'm happy to answer questions on any of the other ones that Your Honors might have. Turning first to the Lopez issue, I believe both that there's insufficient evidence here and that the conceded constitutional error requires, on the jury instruction issue, requires a remand for a new trial separate and apart from the sufficiency claim. But I'd first like to go to the sufficiency claim. There are three reasons, and I view them as separate and independent, as to why the evidence here is insufficient. The first is that Mr. Ortiz-Romero's conduct was wholly domestic, and that's actually identified in Lopez as being not sufficient. And I'm particularly relying on the passage at page 1199 to 1200, the mere act of picking up aliens at a location near the border and transporting them within the United States is not sufficient to support a conviction for aiding and abetting a bridge to the fence. Unless there is some evidence of involvement prior to the point where the domestic activity took place. I agree. If Your Honors are referring to prior involvement in the extraterritorial activity, for instance, if I were the organizer and I hired someone in Tijuana to recruit people, then I would agree 100%. Well, not necessarily if you hired someone. I mean, if the plan was made that he was going to drive, and the plan was all, you know, made together from Tijuana or whatever place outside the United States, and he was part of the planning before it ever came to the United States, then you wouldn't have the Lopez situation. If there was evidence that Mr. Ortiz had agreed before these people crossed the border to drive to pick them up, then I would agree with Your Honor. But there is not that evidence. And that was actually the second separate and independent basis, I think, why there's insufficient evidence here. There's absolutely no evidence whatsoever to link Mr. Ortiz-Romero to the pre-crossing extraterritorial activities. The government, I'm not mistaken, the government points to the fact that the guy jumped in the car. Right. The van. Right. After they arrived at that destination. That's enough, that's enough. That's absolutely true, but that doesn't prove that Mr. Ortiz-Romero agreed during the extraterritorial phase of this offense to participate in it. In fact, the guide, for instance, never said that I was expecting Mr. Ortiz-Romero, that I was expecting a particular person. Was he asked that question? He wasn't asked that question by the party that bears the burden of proof. Well, you said he never said it. I thought he was asked the question. Maybe I misspoke. It does not end the record. They didn't ask that question, so there is no evidence. All we know is that when he met them, the guide got into the van. That's absolutely correct. That is clear. But I think what's also very significant is what the guide did testify was that when I got to the location, the pre-arranged location, nobody was there. I was expecting somebody to be there, but there was nobody there. In addition to that, there's a delay of five to six hours, and then other individuals show up and then leave. In a way, it's very similar to Lopez in that you have the people crossing the border, reaching a place of relative safety where they're no longer being guided, and then the initial transportation, for whatever reason, doesn't show up, and then they wait for several hours beyond that, and then there's no evidence whatsoever of whether Mr. Ortiz-Romero was recruited then or earlier or whether it was a spur-of-the-moment thing. It just isn't in the record. Whereas in Lopez, there was actually even a little bit more of an indication of a pre-arrangement because she had acquired the car in advance and she had said that she had these communications with Jose. But here there is no evidence that the car is not registered to Mr. Ortiz-Romero. There's no evidence that he conferred with anybody prior to arriving at the location or when any such conferences would have taken place. So this case, in a lot of ways, is substantially weaker than the Lopez case. So let me see. So as I understand your argument, the government doesn't – after Lopez, the government recognizes that the instructions were wrong on these counts. Correct. So then the question is, well, was it harmless? Right. On the jury instruction issue. But right now I'm addressing – So on that issue, they say it wasn't – it was harmless. Yes, they do. They do. And then this issue, you just say, well, even in light of the instruction, even under – in light of the wrong instruction, there wasn't sufficient evidence? My point is that the jury was plainly misinstructed, but that the evidence that was offered at this trial would not be sufficient under proper instructions to result in a conviction, and therefore double jeopardy should preclude a retrial. Okay. All right. I see. That was my question. I was wondering. But you don't – you think he should not even be retried. That's absolutely correct. I see. That's the relief that was accorded in Lopez. As I've indicated, I believe that Lopez is a stronger government case. But let me get – So even applying a Lopez instruction had the district court, you know, foresaw what was coming in Lopez, tailored the instructions accordingly. Right. And the jury's returned a verdict. Your argument is the evidence is insufficient. Absolutely. If it went back for a retrial, you're saying that there could not be any evidence that would support a conviction under the statute if it went back for a retrial? I'm not going to speculate as to what other evidence the government might offer. My point is, is that the evidence that was offered at this trial was insufficient and that the double jeopardy clause – Would preclude going back. Exactly. Exactly. And then if I may, the third reason why I believe that – separate and independent reason why I believe there's no sufficient evidence to support this conviction is that there's no evidence that the initial transporter, the guide, Mr. Valdez, the individual who guided them, was continuing his initial transportation. Number one, we know that he wasn't the driver. Number two, his own testimony was that his job was to take the people to this one particular location. He did not testify that he had any responsibilities to transport these people beyond taking them to the safe location that he guided them to through the hills. And then the third reason why there's no evidence that the initial transportation was continuing is that the government actually conceded that Mr. Valdez's role was finished. And if I could just quote from the excerpt of record at page 266, the prosecutor argued, his responsibility ended as soon as his partner took over as the driver. Now, we know that Lopez says that there's really not overlap between these offenses. You know, one ends and the other one begins. The prosecutor argued that the responsibility of the initial transporter ended when the secondary transporter, in this case alleged to be Mr. Ortiz-Romero, began. So under all three of those bases, there's insufficient evidence to support this conviction. Now, the government disagrees with me on that last point, and that's why they think the error is harmless. So I'm just going to segue into the jury instruction issue, if I may. I don't agree with the government's argument that a jury, that beyond a reasonable doubt, a jury would have found that the initial transporter continued to transport for the reasons that I just said. Certainly, if you don't agree with me that that's proof that the government has failed utterly to meet its burden, a rational jury could find, based upon the prosecutor's concession and Mr. Valdez's own testimony, that the initial transporter's role had ended. So if you do review this error for harmless beyond a reasonable doubt. What is the jury to make of the fact that the guy got into the car? Well, it's entirely consistent with the guy's testimony that his role was to take the people to the safe location. And then to hitch a ride. And hitch a ride to, as he said, the city of Chicago. And so that was his city of, actually of Ohio, I'm sorry. He said the city of Ohio. So his role was to basically to get them there, and then he wanted to be brought on to Ohio. So a jury could easily find, based on his testimony and the prosecutor's concession, that his role was over. So it certainly isn't harmless under these facts, and the government has to show that it's harmless beyond a reasonable doubt. But I really don't think you should even get to that question. Because Judge Ronaldson asked earlier what sort of evidence could be offered at a retrial. And it's really an unknown question. I mean, we certainly would have proceeded differently if we knew that when the initial transporter's role was over, should you at that point, that was the key issue in the case. Because the district court, of course, instructed on immediate destination. So who knows what the cross-examination of the guide would have been if all the parties knew. And who knows what the government's examination would have been. We really have a record, I think, that speaks to structural error here, because nobody knew that this was a crucial issue in the case. So people didn't actually direct themselves to it. Certainly, if it was a crucial issue, the prosecutor wouldn't be arguing and closing and conceding the point. So we generally look at erroneous jury instructions as harmless. Absolutely. And that's what Nieder says. Structural error is really difficult. It is. But this is that case. Because in Nieder, you have a situation where the Supreme Court said, look, we're not going to send this back for a retrial, because the retrial is not going to focus on materiality. It's going to focus on all the other issues. Was Lopez an instructional? There was no instructional error issue in Lopez, was there? I raised it, but the court didn't reach it. It was resolved solely on the sufficiency. I think I made a mistake on that, and Mr. Cole caught me on it, and I agree that he was correct about that. There is no instructional ruling in Lopez. But it does set out a legal framework, and I think that that legal framework was not complied with here, and that's why we all agree. In Lopez, I think that the majority opinion talks specifically about the issue of knowledge on the part of Lopez. And the district court made a specific finding that Lopez was not the person that the smuggler made arrangements with to drive the illegal aliens. That's correct. So that's a little bit different in terms of the evidence that's in the record. I agree. There was more affirmative evidence that Ms. Lopez was not the person that was supposed to pick them up initially. But here, there's an absence of any evidence that Mr. Ortiz was the person who was supposed to pick them up immediately. So I think that's a distinction, but I don't think it makes a difference in ultimately how the case gets out, because it's their job to offer evidence from which a jury could conclude beyond a reasonable doubt that he was the one that was supposed to pick them up. That was from the evidence and the inferences in the light most favorable to the government. I guess we have to see what the government thinks. That's absolutely the right standard. And there's no evidence in this record from which a jury could find beyond a reasonable doubt that Mr. Ortiz had agreed during the extraterritorial phase. What we do know is that whoever was supposed to be there wasn't there. Maybe that was Mr. Ortiz, maybe it wasn't. But the government had to prove that beyond a reasonable doubt. You said whoever agreed to be where wasn't there? At the spot. What were you talking about? I'm referring to the spot where the people were hiding. They were guided through the hills, through Tecate, to a place near the highway, and they were hiding in the bushes awaiting transportation. And the guide's testimony was that the person who was supposed to be there wasn't there. I was expecting when I arrived that there would be transportation. And he didn't name Mr. Ortiz as that person? No, he did not. And the government had every incentive to put that evidence in if, in fact, they had it, because that would have helped their case. But he did not say that Mr. Ortiz was the person. And then there's a four- to six-hour gap, depending on whether you credit the juvenile's testimony or the guide's testimony, until Mr. Ortiz actually arrived, with no evidence in the record one way or the other as to when he reached his agreement. If I may, I'd like to move on to the identification issue. Because the first argument applies only to the brings-to accounts. This one applies across the board to all accounts. And just in a nutshell, we've got three identifications, two different methods. The first one is a show-up. In the show-up at the scene of the crime, at the scene of the crash, actually, Mr. Ortiz and Mr. Valdes are both in handcuffs in a particular location apart from everybody else. The Border Patrol agent says to the witness, which one is the driver, which one is the guide? Now, everyone knew who the guide was, because the guide had met them in Tijuana at the hotel, taken them from Tijuana to Tecate, taken them from Tecate to the area. So everyone knew who the guide was. So basically, it was effectively telling this particular witness that the other guy is the driver. That is an extremely suggestive identification procedure. I think clearly gets us into the second stage, where the government bears the burden by clearing convincing evidence of showing that this identification was otherwise reliable, and they just can't do that. So you think the blood evidence and the – didn't the guide identify Mr. Ortiz? Yes, he did, Your Honor. I think the government says this error is harmless because of – and I don't want to do the argument for them, but because of the blood evidence, because of the identification by the cooperating witness who had a cooperation agreement and who said he wanted to please the prosecutor during his testimony. But still, I mean, that's evidence. It's evidence. There's no question. It's in the record, and I think that it does not show that this is harmless beyond a reasonable doubt for a few reasons. I think the most significant reason is that this jury deliberated over three days. They went out. I can't tell you exactly what time. I was trying to figure that out last night. But they went out, I think, on May the 3rd. They came back on May the 4th, deliberated the entire day, and then came back on May the 5th and deliberated for another hour. What time? Another what? Hour and a half on the last day. That's not that long. There's a lot here. There was a lot in this case to consider. There's a lot of counts, but the issues were really simple. The case was really tried about whether or not Mr. Ortiz Romero was the driver. So I don't think that there was a lot of stuff for them to be talking about. The expert testimony, just to understand the blood droppings and blood splatter evidence would take considerable time. I think that's fair, Your Honor. But to the extent that it took a considerable amount of time, it's because it's a closed case and they had to deliberate over an extended period of time. So I think that supports the notion that the error was not harmless. The government relied upon the identifications in its closing. So the government thought that evidence was important and wanted to emphasize it to the jury. I've cited in the briefs the pages in which they argued it. And then the last thing is you still have Mr. Ortiz Romero who testified on his own behalf and said, look, I didn't do it. So there's evidence from our side. It's not a case where we didn't put on a case. We put on our own expert. We put on the client. I mean, there was evidence from which a jury could harbor a reasonable doubt. And it took them a long time on a case where really it came down to whether or not there was evidence that he was the driver. Now, I think I've got a couple more minutes. I'd like to talk a little bit about the other identifications. The other two identifications were photo identifications. And basically our argument with respect to those as to why they're suggestive is that the agents told these two witnesses that the driver is in this particular lineup. And they told them that after they had already looked at the lineup with the guide. And both the lineups are actually in the excerpt of record. The first one, everyone knows the guide, as I pointed out earlier. The guide is photograph number two. They pick the guide. And then the second photo identification has come. This relates to the juvenile and Mr. Hernandez-Estrada. Those witnesses are told that the driver is in this lineup. And he said, which one of these is the driver? So they know that they're supposed to pick somebody. Photograph number two, the same location as the guide, is Mr. Ortiz-Romero's photograph. So I think we've got a highly suggestive situation right off the bat. And I'd like to cite a couple of cases. The Wiseman case from the Tenth Circuit, which I cited in the briefs, says that it's highly suggestive in order to tell people that there's a suspect. This is worse than telling them that there's a suspect. This is telling them that the driver is actually in these photographs. The same thing goes for the Saunders case, which I cited in the 28J. They were told there that someone had been arrested. And they said, look, you shouldn't tell them that, because that might put pressure on the witness to make an identification, even if he is not fully confident. But I think the thing that really salts the notion that this is an excessively suggestive procedure is that I cited an empirical study, or an article by Professor Wells, and they actually had some statistics on the rate of identification errors when you say things like this to mock individuals trying to make identifications. And there's a substantial difference. Not warning the eyewitnesses that the culprit might not be in the lineup resulted in 78 percent of the eyewitnesses attempting an identification from the culprit absent lineup. So basically that's evidence that the pressure that the Wiseman court referred to is real, that it actually exists, and that only 33 percent of the individuals looking at lineups who were given proper instructions made that same mistake. So when you talk about dropping from 78 percent to 33 percent, that is an impermissibly suggestive procedure. So I think that we get past the first rung, which is we have to show an overly suggestive procedure. Then the government bears the burden by clearing convincing evidence to show that the IDs are otherwise unreliable. And I think the one thing that's very... Reliable. Yeah, they have to show they're reliable. Absolutely, Your Honor. I'm sorry. And I think that it's – I don't think anyone's really going to dispute. I mean, there's one argument maybe that the juvenile had a better look, but pretty much everybody is making an identification based upon a view and profile. They say that the driver's looking back like this, and that's what the basis of their identification is. It's a short time. They don't get a full-face view. I don't think there's any evidence that anybody did. So in terms of the opportunity to view, that factor favors suppression. Nobody gave any sort of evidence that they had any particular degree of attention, so the government didn't meet its burden there. The accuracy of the description factor, not one person gave a description of Mr. Ortiz Romero's face. Now, if you look at the photo, it's not a very good photo because it's Xerox, but you can see he's kind of jowly. He's a little overweight. He's got thick lips. None of that. And, in fact, the woman who had to show up, she couldn't even say whether or not he had a mustache or a beard, and she's supposedly making an identification based upon his face, and that's at ER-17. The same testimony from Hernandez-Estrada. The Border Patrol asked him if he saw whether or not the guy had a beard or any facial hair. He couldn't answer. That's at ER-111, and the juvenile had nothing to say at all about his face. So I think the government did not meet its burden by clear and convincing evidence, and I'd like to reserve my 31 seconds. I'll give you a minute. Thank you, Your Honor. Thank you, Your Honor. Good morning. May it please the Court. William Cole for the United States. I guess I'll take these issues in the same order that Mr. Hubachek did. First, as to Lopez, Your Honors, I believe that the defense has stated the wrong standard in the Lopez. Lopez was actually crystal clear on when the offense is completed. That's the whole point of Lopez. That's what Lopez was about, is when is the offense of bringing aliens to the United States completed. What are we saying, Lopez? Lopez said that it's completed at the end of the initial transporter's physical involvement and conduct. Now, the reason, it doesn't end at the border. It doesn't matter if Mr. Ortiz acted, if the defendant acted during the extraterritorial portion, because that's not what Lopez said. Lopez said, yes, the crime begins in another country, but it continues until the end of the initial transporter's conduct or physical involvement. It says that over and over again. But didn't Lopez also say that someone could not be guilty of aiding in a brings-to-offense unless they were involved in something other than just domestic transportation of the aliens? No. I think Lopez fairly said that. Your Honor, I don't believe so. What I believe that Lopez said is if that is all, if that is the only evidence, is that all you can show is they transported people north of the border. But that's not what we showed here. Well, that's what I'm saying. That's what the ruling is, first of all. Let's agree on what the ruling is. The ruling is if all the defendant does is transport in the United States, there is no complicity for brings-to-offense. Your Honor, I would not agree that that's the holding. I would agree that they said there that if that is all the government showed, that that would not be sufficient. That's not the holding because there would certainly be cases under, and if you read Lopez it's clear, there could certainly be cases where all the person physically does is transport people north of the border, but they are aiding and abetting an offense that has not yet been completed. Because the whole point here is just one element of the very standard aiding and abetting instruction, which is when is the offense completed. We know all the other elements, and none of those are in dispute in this case. Men's ray is not in dispute. The fact that bring-to-offense was committed by somebody, it's simply when was it completed and did this person aid and abet. But the issue is, yeah, that's right, did they aid and abet that person. And so in Lopez, the majority view was once the immediate destination is reached, once the immediate destination is reached or the first dropping-off point. That wasn't in the majority opinion. Sure. Then the crime is complete, right? No, no, no. In fact, the immediate destination was the old standard under Ramirez-Martinez that was being reviewed in Lopez, and Lopez rejected it. When is it complete? It's complete when the initial transporter, the foot guide, because that was a foot guide case as well, and they were very clear, the foot guide is the initial transporter, when the initial transporter ceases to transport the alien. Okay, so in this case, that would be when the initial transporter, wherever they reached the point where they were hiding for the second phase? The government's point is no, and the reason being is because in Lopez, the initial transporter actually left them. They were in the mountains by themselves. He went wherever he went. They were in the mountains by themselves for a couple days before the driver showed up. His physical conduct involvement ceased way before the driver showed up. Here, the driver showed up, and the transporter kept transporting, and the reason, not just getting into the van. Getting into the van, we can argue all day about how significant that is. So the guy continued to be the transporter when he got into the van? Even before he got into the van, because remember, Ortiz drives up, and what does the guy do? As pointed out in the government's brief, the guide says, the guide then gives instructions. He tells all the aliens to run as fast as they can, to get in the van, to lay down in the back and hide, and this court has made very clear in numerous previous cases that giving instructions, verbal commands and guiding like that, telling people where to go and encouraging them along is transportation, and the defense in its response to that argument. But that happened after they had come to settle for about four hours or so, five hours? Sure, yes. They had come to rest, quote, unquote. They had come to rest, but they certainly were still with the guide, who was the transporter, and he continued to transport them, and that was after Mr. Ortiz arrived at the scene. Mr. Ortiz arrived at the scene. Have we ever defined the term transported? Yes, Your Honor. In Yoshida and in Carranza-Chaydez, which are both cited in the government's supplemental brief, this court has said that transporting can be encouraging, bringing along, giving somebody commands and instructions, walking along with them. It doesn't have to be, of course, in a vessel driving them, and this court has made that very clear, that the act of transporting. In fact, Yoshida was a bringing-to case that involved somebody who escorted people through airports and directed them onto a plane, and the court said, of course that's bringing. That is bringing in the ordinary sense of the word. Mr. Valdez, the foot guide, under the ordinary sense of the word, and this court's previous authorities transported those aliens from the bushes into that van. So there's no real evidence, as I recall, and you can correct me if I'm wrong, that Ortiz, the defendant here, that there had been any contact with him prior to this incident? Your Honor is correct, that there was no evidence of any prior contact between Valdez and the guy. Even when the guy testified, he didn't testify that he was waiting for Ortiz Hernandez to show up? Him specifically? No, you're right, he did not. No evidence of that? No. So your argument, Ortiz Hernandez is connected to all this because the guy gets into the van? No, my argument is that Ortiz is connected to all of this because he took an affirmative step, an affirmative act, and there's no disputes to mens rea. Again, the instruction on mens rea was accurate, 9th Circuit law, and there's been no argument that the instruction was wrong or that the jury couldn't have found mens rea. He took a specific act to aid the bringing to offense before Mr. Valdez stopped transporting. That's what our point is. Mr. Valdez could have not gotten in the van. Mr. Valdez could have said, everybody in the van, run, jump in, get in, hide, and then Valdez could have left, and we'd be making the same argument, because Valdez was the initial transporter. So then when does Lopez ever reply? As in Lopez, when, in fact, there is no... So the guy has to abandon them and move on and leave them and leave, you know, the people he was bringing across, the aliens, abandon them, leave them there. Well, not necessarily abandon. Abandon is the wrong word. Well, no, I understand. What has to happen under Lopez is the initial transporter has to stop transporting. Here's what it says. As stated previously, we hold that a brings to offense under 1324A2 terminates when the initial transporter drops the aliens off at a location in the United States. That's what Lopez says. Yes, and he had not dropped them off until they were sitting in that van. And we can argue as to whether he ever dropped them off since he got in and kept giving instructions to them. But I'll even, for purposes of today... Who was the initial transporter? Mr. Valdez. Now, Your Honor, there's an argument also to be made out there, which is a little bit far-filled from this case, that the initial transporter isn't just the foot guy, but it's whoever is the kingpin of the alien smuggling organization who's moving all these players and moving all these people. But in the Lopez sense, it's Mr. Valdez, the foot guy. So here's the problem I have with your argument, is that once they reach the location where they were, whatever, inactive for four or five hours, you don't think that's when they had been dropped off at a location in the United States? Well, Your Honor, I don't think that there's anything significant about being inactive. They may have been. There's all kinds of bushes and crevasses and ravines out there in the mountains, and the fact they stopped somewhere to hide or to rest or to wait for the next ability to move forward doesn't seem to be... What does dropped off mean in your view? Dropped off, because if you also read Lopez, they state in several other places what they're holding, and they use similar but slightly different wording all the time. One time they say dropped off. Look at the very beginning of the first page of the opinion. They say dropped off, but they say in other words, when the initial transporter ceases transporting. And so I would say dropped off is when the initial transporter ceases transporting. He ceases his physical involvement in moving the aliens. So wait, so now hold on. So as I understood it, you basically... The problem here is the instruction that the court gave. Yes. And you don't... I'm not quite sure, do you agree that the instruction was incorrect? Yes, it was because... Okay, so your argument is that it's just harmless. Yes. How can you say that in this conversation that we're having? It's at a minimum there's sufficient evidence. Now, our argument's both. I mean... Beyond a reasonable doubt. The reason I say it's harmless, Your Honor, is because I believe that if you take Val Lopez at his word, that it's until the initial transporter ceases transporting or drops off, if you take it and read that in a simple, common, ordinary sense of what that means, the evidence is uncontroverted that Val Lopez never did that. He moved them from the bushes to the van. It was the same guy. He was still moving them. And so if you take Valdez at face value, I believe that it was harmless. However, even if the court feels it wasn't harmless, there certainly was evidence that a rational prior fact. A rational prior fact. It could be a retrial. But, counsel, what do you do with the language in Lopez that says the mere act of picking up aliens at a location near the border and transporting them within the United States is not sufficient to support a conviction for aiding and abetting a brings-to-offense? What do you do with that language? What I do with that language, Your Honor, is I say that's true. And that statement was made in the context of them finding no connection, no action by the part of the driver while the offense was still ongoing. In other words, they looked at the record and said, did this driver do something that we can show was done with intent before the offense was completed under this new standard announced in Lopez? And they said we can't. Well, in that case, the mere act of driving and picking them up north of the border cannot support a conviction. Because the initial transport, in your view, had left the scene. They found that the offense had been completed. Really all that the court's saying in that sentence, Your Honor, is quoted, is that the offense was completed before this defendant acted. It was completed. And so it couldn't be convicted of aiding and abetting the completed offense. And the government doesn't dispute that in that case. We disputed it at the time. We lost. But here we're in a very different scenario because here, unlike in Lopez, Ortiz without question acted when Valdez was still moving the aliens. And that takes this case. The defense has said several times this is a far weaker case than Lopez. I would strongly disagree because Valdez, he was still moving them. What do you do with the testimony from Mr. Ortiz that he became a passenger at that point as opposed to a transporter? Oh, Your Honor. Well, I think you may be referring to the argument by the government in closing that his responsibility ended once he sat down in the van. Yeah, I think he said his agreement was that he was to drive them to a certain point and then he was to become a passenger. Oh, it was, yes, Mr. Valdez's testimony that his job was to guide them in Yeah, Mr. Valdez. And then he would get a free ride to Ohio. Right. He would get a ride to Ohio. Right. Would he be a transporter at that point then if he was just getting a ride? At some point his bringing to a fence would have ended. Did it end when he finished transporting them into the van? Did it continue because he was still riding as a passenger in the van and giving instructions even then to the aliens inside the van? The government would submit that it didn't end because he got in the van. He was still moving them. But I will concede that's a closer question. And if the court was to determine that once he sat down and he sat himself and seat belted himself in in that passenger seat that the bringing to a fence ended and transportation began, that would be a reasonable conclusion on these facts. But the government would say we would still then prevail because that doesn't account for all the conduct that happened before he sat down in the van when Ortiz was present. Ortiz was present when Valdez directed those aliens from the bushes into the van. And that's transportation. Do we know if the defendant here exited the vehicle, the van, and helped sort of scoot the aliens into the van? There's no testimony to that. In fact, the testimony I believe is that it was Valdez giving the instructions to bring in and Valdez ordering the people in and that Ortiz sat in the van. I think that was all the indication of the testimony. There's no testimony that Ortiz got out and moved them from the bushes at all. In fact, Hilario, the female material witness who identified the driver, said she saw him in the seat when she was getting into the van and that's when she had a chance to look at him. And so all the more indicating that Ortiz was sitting there waiting. He was sitting there waiting. He had the intent. He took affirmative steps and the offense had not been completed. And so that's the government's position on the Lopez issue. As for the identifications, I guess I'll start with the first prong of the analysis, which I guess would make sense, which is the suggestiveness. You know, the government, there was some mixed testimony, but the government's not going to try to make an argument that our own eyewitness got it wrong and what the officer said to her. And so if you take Hilario, the officer said he never did that. He said he never brought two people in front of her and said, who's the guy, who's the driver? But the defense sent out an investigator, and the investigator came back with a statement from her that that's what happened. And she didn't deny that, and she said that in court. And the government, it is what it is. But she's not the only one who said that. Well, she's the only one who had to show up. Yes, she is the only one who said that because the other two were shown six-pack photo identification. But they still said, one's the driver, the driver's here, or something to suggest that the driver is in this group. Yes, yes. Well, that's pretty consistent. Yes. And so the government's not going to try to do that. I didn't take your argument in your brief, and I read your brief that you were all, you know. No. But it wasn't suggestive. It was suggestive. Your argument was more that it was satisfied the reliability of the Biggers test, and that even if it didn't meet Biggers, it was harmless. Right, right. And that's our position today. There were four identifications, and Your Honor pointed that out in one of your questions. There were four identifications made in court, not just the three that are challenged here. One went totally unchallenged, and from somebody for good reason, because this person never even had a – there was never even any testimony about any suggestiveness of any pretrial identification procedures from the fourth ID. And the fourth ID was from the guy who sat in the passenger seat next to this driver who ran away with the driver, the defendant, and who had plenty of chance to see him. How long were they in the van together? You know, it's not totally clear, but they had gotten off of – they had been in the van long enough to get from smaller highway to Interstate 8 and to be clear out by East – it's not really clear how long they were in the van, but they had – it was more than a moment. It was at least several miles that they had been in the van together. And so you have this other identification. You also have, I think what's important – and I guess I'm sort of jumping ahead to the harmless error, because I think it's so overwhelming that in some ways I don't think it's worth spending a whole lot of time on the eyewitness identifications. All of these eyewitnesses said something besides, he's the driver. They also said, oh, by the way, he was never in the back of the van. He was never with us in T01. We never saw him anywhere on our journey on foot. We never saw him in the back of the van. We saw him in the driver's seat. Now, the problem – and other witnesses who didn't ID him at all also said he was never in the back of the van. Well, what's the jury going to do with that? That was clear evidence that adds to the harmless error analysis that Mr. Ortiz was in the driver's – he didn't fall out of the heavens. He was never in the back of the van with these aliens where he claimed he was, contrary to all the physical evidence. He was in the driver's seat. In addition, of course, the DNA evidence was very powerful. This man, this defendant was found fleeing from the accident with the foot guide with a gaping wound on the left side of his head. And your honors don't have the benefit of seeing the photograph of the van, but the record is stated in the briefs and in the record is that the van was crushed exactly on that point. The van was crushed down on the driver's head. Ortiz's blood was on the trim piece. Right was crushed down to the head. It was on the headrest. It was off the seat belt. Ortiz's blood. And yet he is saying on the stand that he was in the far rear back, behind the rear bench seat of a minivan when the accident occurred. Both experts agreed there could be no explanation under any known laws of physics for how his blood got all the way over or how he would have moved all the way forward in a van that had no forward impact. There was no impact moving anybody forward in the vehicle. How he supposedly got that physician to deposit all that blood. And so if you look at the totality of all that evidence, there's also the testimony that there were only two people wearing seat belts. The witnesses were clear. There were two people wearing seat belts, the driver and the guide. Well, there were two people who ran, the driver and the guide, Mr. Ortiz and the guide. If you look at all this evidence together, even assuming that the suggestions of the IDs and even assuming that we didn't meet the second standard, it's harmless. But I want to go back to the second prong now for a moment because the government believes these were sufficiently reliable. The district court heard the evidence. The district court heard the cross-examination at the pretrial hearings, much of it by Mr. Hubachek. It was very vigorously contested at the pretrial hearing. There was vigorous cross-examination at the trial on the issues as to reliability. And the district judge said, you know what, this goes to wait. The jury should be able to hear this evidence. And the government believes that was correct. All the witnesses saw the driver in a minivan. A minivan is a very small space. They were closer to the driver than I am to you. These people were not casual observers. They weren't shopping in a convenience store when a stick-up suddenly took place. They were not casual observers. They were in a van taking instructions from the people who were guiding them. I thought they were sort of piled one on top of another thing. Oh, they were. Back of the van. It was helter-skelter. There were 11, is that correct? Yes. It was a lot of people packed into a small space, but they weren't casual observers. And that's important because this court and other courts have looked at that factor to say, what reason did the eyewitness have to be paying attention? And I'll tell you, there was every reason for these people to pay attention when a driver in this situation turns around from only four feet away and says, stay down or get down, don't move, crouch down. And they all saw him in the same way. You know, it's remarkable. This was not a situation where IDs were made together. There weren't three people in a room looking at the lineup together. They were all separate, and all of them say the same thing. I saw him when he turned around and said, get down. And, of course, Valdez corroborates, yeah, he did turn around and tell him to get down. And all of this is corroborative of the reliability, at least enough reliability, to let a jury weigh it. I mean, there was vigorous cross-examination, and jurors aren't born yesterday. They can weigh this and judge this evidence. And the government believes it was proper for the court to let the jury weigh it, along with all the other evidence. And unless there's any other specific questions, the government will submit. Thanks. Thank you, sir. Did you try this case, counsel? I did. Me too. You have a minute and a half. Thank you, Your Honor. If I just briefly go back to where Mr. Coles just left off, the talk about cross-corroboration between the identifications and with Mr. Valdez is not an appropriate consideration with respect to the second stage of this process. The first stage is whether or not it's a suggestive procedure. I think it is. The second stage is the Biggers factors, where the district court should have and never did weigh the corrupting influence. And this is almost a quote from Biggers. You have to weigh the corrupting influence of the impermissible procedure against the Biggers factors and then make a decision. All the district court said was that this goes to cross-examination. So I don't think you have compliance with the Biggers analysis. And then the third process is whether or not the error is harmless beyond a reasonable doubt. Now, there I acknowledge that Mr. Valdez's identification can be properly considered at that point, but not the other three because those all should have been suppressed. So I think that there's a fundamental flaw in the way the government's approaching this. And the fact that you don't consider other evidence of guilt in the second stage is made clear by the Green case, which I 28-J'd this week. Now, I would like to get back to the interpretation issue from Lopez. And I think Judge Paez's question is, well, what's left of Lopez if we adopt the government's position? I think it is really what the issue is here. Lopez has underlying fundamental considerations about what Congress intended. What it intended was for there not to be a situation where you're treating all the transporters the same way you treat the brings tours. That's why there's a distinction drawn in the case, and it's based upon the multiple offenses that are set out in 1324. If you adopt the government's reading of Lopez, that will effectively frustrate this Court's desire to effectuate Congress's intent. What about the government's distinction that the offense was not completed because Mr. Valdez, the transporter, was still transporting, so the offense was still ongoing at the time Mr. Ortiz became involved? Well, Lopez also says that once the secondary transporter starts, then it doesn't continue on. Where does it say that? It says that in the end of the section on the Vowiel case, and I'm quoting, as in Vowiel then. What page are you reading from? 1196, Your Honor. As in Vowiel then, the brings to offense does not continue beyond the point at which the transports wholly within offense begins. So you've got that quote, and you've got the fact that this Court repeatedly said that just picking up on this side of the border doesn't do it. That's all we have here. I'd submit unless Your Honors have any other questions. No further questions. I don't. I don't have any. Thank you, Your Honors.  We appreciate your arguments. Court for the week will come to an end. It's been a long week. Thank you all.
judges: Paez, Rawlinson, Conlon